# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 1

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------X
JFURTI, LLC, and JACOB FRYDMAN,

             Index No:

     Plaintiffs,

  - against -         SUMMONS AND
               VERIFIED COMPLAINT
DOWNEY BRAND LLP and ANTHONY   WITH JURY DEMAND
AROSTEGUI,

     Defendants.
-------------------------------------------------X

  To the above-named Defendants:

  YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a

copy of your answer, or if the complaint is not served with this summons, to serve a notice of

appearance, on the plaintiff's attorneys within twenty (20) days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons is not

personally delivered to you within the State of New York); and in case of your failure to appear or

answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
   April 1, 2019

             Neal Brickman, Esq.
             The Law Offices of Neal Brickman, P.C.
             Attorneys for Plaintiffs
             420 Madison Avenue - Suite 2440
             New York, New York 10170
             (212) 986-6840

To:  Downey Brand LLP
   621 Capitol Mall - 18th Floor
   Sacramento, California 95814

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM    INDEX NO. 651886/2019

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 04/01/2019

Anthony Arostegui
c/o Downey Brand LLP
621 Capitol Mall - 18th Floor
Sacramento, California 95814

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM

NYSCEF DOC. NO. 2

INDEX NO. 651886/2019

RECEIVED NYSCEF: 04/01/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JFURTI, LLC, and JACOB FRYDMAN

                    Plaintiffs,     :

-against-                       :

DOWNEY BRAND LLP and ANTHONY
AROSTEGUI                       :

                    Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No.:

**VERIFIED COMPLAINT
AND JURY DEMAND**

COME NOW Plaintiffs, JFURTI, LLC (hereinafter "JFURTI"), and Jacob Frydman

(hereinafter "Frydman") (collectively "Plaintiffs"), by and through their undersigned attorneys,

The Law Offices of Neal Brickman, P.C., located at 420 Lexington Avenue, Suite 2440, New

York, New York 10170, and as and for their complaint against Defendants, Downey Brand LLP

(hereinafter "Downey") and attorney Anthony Arostegui, a partner or former partner at Downey

(hereinafter "Arostegui" and together with Downey, "Defendants"), state and allege as follows:

### NATURE OF THE ACTION

    1.    This is an action for damages arising from Defendants' fraudulent

inducement and breach of a written agreement dated September 15, 2015 ("Letter Agreement")

("Exhibit A") entered into with, among others, Plaintiffs, in connection with the sale of the

Plaintiffs' ownership interests in affiliated companies (the "United Realty Entities"), most

notably, United Realty Advisors, LP ("URA"), that controlled and operated United Realty Trust

Incorporated, a New York-based public non-traded real estate investment trust (the "REIT"). On

or about September 15, 2015, Plaintiffs agreed to enter into a Master Agreement ("Master

1

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM          INDEX NO. 651886/2019
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 04/01/2019

Agreement") and Asset Contribution Agreement ("Contribution Agreement") that memorialized the terms of the sale between, among others, the United Realty Entities, to Suneet Singal ("Singal") and his California-based company, First Capital Real Estate Incorporated and various of its affiliates ("FCREI" and collectively with Singal, "FC Purchasers") as well as a consulting agreement with Frydman to act as Chief Investment Officer of the REIT and provide consulting services (the "Consulting Agreement") to the FC Purchasers, which were represented by defendants Arostegui and his law firm, Downey (the "September 2015 Transaction").[1]

2.      Following the September 2015 Transaction, The United Realty Entitics, together with the REIT, were rebranded as First Capital entities, with the REIT becoming First Capital Real Estate Trust Incorporated ("FC REIT"), United Realty Capital Operating Partnership LP becoming the First Capital Real Estate Operating Partnership, LP ("First Capital OP" or "the Operating Partnership"), and URA becoming First Capital Real Estate Advisors, LP ("FC Advisors").

3.      Defendants defrauded Plaintiffs by inducing them to enter into the Master Agreement , the Contribution Agreement and the Consulting Agreement (collectively, the "2015 Transaction Agreements"), based on intentional misrepresentations as to the ownership and value of a $150 million portfolio of real estate assets that the FC Purchasers agreed to sell, assign,

---

[1] In an action styled *JFURTI, LLC et al v Suneet Singal et al.*, 17-cv-7206, SDNY 2018, Plaintiffs asserted these claims among others in a derivative action in the Southern District of New York. By Decision and Order dated November 12, 2018, that action was dismissed as being an improper derivative action. The Decision does not address Plaintiffs' claims against Defendants herein, and expressly leaves open the possibility to bring a direct (rather than derivative) action in New York State court.

2

convey, and transfer to the REIT in exchange for Operating Partnership Units ("OP Units")

issued by the REIT in an UPREIT Transaction.[2]

    4.    The September 2015 Transaction was structured as follows:

    (i)    the FC Purchasers agreed to sell, transfer, assign and convey a portfolio of real estate assets with a value of approximately $150 million purportedly comprised of hotels, other stabilized and value-added real estate assets, developable land, and residential real properties and related interests represented by the FC Purchasers and Defendants to be owned in whole or significant part and controlled by the FC Purchasers (the "FC Portfolio") to the public REIT based on their then existing fair market value (the "FC Portfolio FMV");

    (ii)    the FC Portfolio FMV of approximately $154,000,000.00 was determined by agreement of the parties based on a series of third-party appraisals and a comprehensive due diligence investigation undertaken by Plaintiffs, which due diligence investigation was itself based in part on the documents and information provided, and representations and warranties made, by the FC Purchasers and Defendants to Plaintiffs;

---

[2] Each OP Unit had the exact same rights as, and were each convertible into, shares of the public REIT at an exchange ratio of one OP Unit for one share of stock in the REIT. Under the tax laws at the time of the September 2015 Transaction, by exchanging the portfolio of real estate assets for OP Units in the REIT, the FC purchasers were legally able to defer any realization of taxable income on the sale and transfer of their $175 million portfolios of real estate assets until such time as they, or the holders thereof, would convert the OP Units into shares of the REIT.

3

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

(iii)    at the time of the September 2015 Transaction certain of the assets comprising the FC Portfolio were then encumbered by mortgage and related debt of approximately $106 million (the "FC Portfolio Debt"), and were being sold, transferred, assigned and conveyed to the public REIT subject to said FC Portfolio Debt, which FC Portfolio Debt was assumed by, and the obligation for repayment of FC Portfolio Debt was undertaken by, the public REIT;

(iv)    the approximately $48,000,000.00 equity value of the FC Purchasers in the FC Portfolio - which was determined by subtracting the FC Portfolio Debt from the FC Portfolio FMV (the "FC Portfolio Net Asset Value") - was paid to the FC Purchasers by the public REIT by the issuance of OP Units in a tax-deferred UP-REIT transaction;[3]

(v)    the approximately $48 million Net Asset Value was paid to the FC Purchasers by issuance of such number of OP Units, which, at a conversion ratio of one (1) OP Unit for one (1) share of common stock of the public REIT at the then most recent Net Asset Value of one share of public REIT common stock as published and disclosed by the REIT in public filings with the U.S. Securities & Exchange Commission (the

---

[3] Pursuant to the tax laws then in effect, by structuring the September 2015 Transaction as a pre-transaction, and issuing OP units to the FC Purchasers rather than cash or shares of common stock in the public REIT, the FC Purchasers were able to defer (or possibly avoid) the payment of any income or capital gains tax on the appreciated value of the FC Portfolio.

4

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

"REIT Share Price"), and each OP Unit so issued had the same rights and privileges, and entitlement to voting, distributions and dividends as each share of the public REIT's common stock , and each OP Unit was fully convertible, at the discretion of the holder, into one share of the public REIT's common stock;

(vi)     As a public nontraded REIT, the REIT itself had no internalized management nor did it have any paid employees. Rather it was wholly controlled by the Advisor, and the Advisor was compensated by the REIT by payment of a variety of contractually determined fees, including, without limitation, asset acquisition fees, asset management fees, property management fees, asset disposition fees, development fees, leasing fees, financing fees and a considerable "promote" equal to 15% of all net distributable cash of the REIT in excess of an 8% returned to the REIT shareholders and 15% of all capital distributions in excess of return of capital plus the 8% returned to the REITs shareholders. Based on the Advisor's anticipated income stream the fair market value of the Advisor at the time of the September 2015 Transaction was valued in excess of · $130 million;

(vii)    Unlike the REIT, the Advisor was a private entity wholly controlled and owned by Plaintiffs and their affiliates. Whoever controlled the Advisor controlled the public REIT and became the beneficiary of the extensive

5

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM          INDEX NO. 651886/2019
NYSCEF DOC. NO. 2                                         RECEIVED NYSCEF: 04/01/2019

income stream which was anticipated to be earned by the Advisor in its

capacity as advisor to the public REIT;

(viii)   As a material component of the September 2015 Transaction the FC

Purchasers were acquiring 100% of the ownership interests in the

Advisor,[4] and 100% of the ownership interests in certain other affiliated

entities of the Advisor which handled property management services and

other functions for the benefit of the public REIT and the Advisor, and

which entities were also owned and controlled by the plaintiffs, in

exchange for a series of payments, a portion of which was to be paid in

cash, a portion of which to be paid by issuance of a promissory note and a

significant component of which was to be paid by transferring to Plaintiffs

$35 million of the OP units then being issued by the public REIT to the

FC Purchasers in exchange for their equity in the FC Portfolio being

transferred to the public REIT;

(ix)    the $35 million in OP Units paid by the FC Purchasers as consideration to

Plaintiffs for acquisition of the Advisor and other entities owned by them,

were required to be redeemed from the Plaintiffs by payment to the

Plaintiffs of three cash payments over a 90 day schedule, which, if timely

paid could be redeemed for $25 million, and if not timely paid was to be

redeemed for $35 million in cash;

---

[4] Pursuant to the Consulting Agreement, the FC Purchasers were to reconvey 20% of the ownership interests in the Adviser to Mr. Frydman.

6

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM    INDEX NO. 651886/2019

NYSCEF DOC. NO. 2                                               RECEIVED NYSCEF: 04/01/2019

    (x)    At the closing on September 15, 2015 the FC Purchasers disclosed to

Plaintiffs that they were short $2 million of the cash portion of the

purchase price and requested that the Plaintiffs agree to accept a

promissory note for said $2 million to be paid on or before September 22,

2015 in lieu of $2 million in cash which was to be paid on the closing

date. In order to accommodate this request, the Plaintiffs agreed to accept

such promissory note, but only on the condition that the FC Purchasers

secure said obligation by posting an additional $10 million of OP units as

collateral security for said payment, and an express agreement that if the

$2 million were not timely paid by the maturity date, the $10 million in

OP units would be additional consideration and immediately transferred to

the Plaintiffs.

    (xi)    At the time of the September 2015 Transaction Mr. Frydman was the

Chief Executive Officer and Chairman of the Board of the REIT and the

Advisor and the FC Purchasers needed Mr. Frydman to remain the Chief

Investment Officer of the REIT and the Advisor under the then existing

regulations of the US Securities and Exchange Commission for continuity

of investment for the REIT. Therefore, as a component of the September

2015 Transaction the FC Purchasers and Mr. Frydman entered into the

Consulting Agreement, pursuant to which Mr. Frydman agreed to remain

the Chief Investment Officer of the public REIT and the Advisor, and

7

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM         INDEX NO. 651886/2019
NYSCEF DOC. NO. 2                                        RECEIVED NYSCEF: 04/01/2019

provide additional consulting services in exchange for a payment of $500,000 and 20% ownership of the Advisor, which 20% was at the time worth in excess of $26 million, and a 50% interest in First Capital Funds Management, LLC.

5.      On September 15, 2015, the transactions contemplated pursuant to the September 2015 Transaction Agreements closed, but, the FC Purchasers failed to redeem the $35 million in OP Units within the required 90 days; and failed to pay the $2 million promissory note by September 22, 2015, and as a result, rather than cash, Plaintiffs were left with $45 million in unredeemed OP Units, certain other promissory notes of approximately $4 million, and ownership of 20% of the Advisor, for a total consideration to Plaintiffs of $74 million.

6.      The ability of Plaintiffs to collect the $74 million consideration which was the benefit of their contractual bargain and the Plaintiffs' ability to realize said contractual benefit was therefore wholly dependent on the value of the FC Portfolio assets transferred to the public REIT being worth $154 million with a Net Asset Value of $45 million for the OP units conveyed to Plaintiffs as consideration for the sale and transfer to the FC Purchasers of their interests in the Advisor, the additional other United Realty Entities conveyed and transferred by them to the FC Purchasers pursuant to the September 2015 Transaction Agreements.

7.      If the FC Portfolio FMV was less than $154 million, then the Net Asset Value of the OP Units conveyed to Plaintiffs would be less than the $45 million which was based on the FC Portfolio FMV less the $106 million in FC Portfolio Debt assumed by the public REIT.

8.      Since the closing of the September 2015 Transaction, Plaintiffs have discovered, among other things, that Defendants made intentionally false representations,

8

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM

NYSCEF DOC. NO. 2

INDEX NO. 651886/2019

RECEIVED NYSCEF: 04/01/2019

including materially false written representations and warranties, regarding the value and bona fides of certain properties comprising the FC Portfolio and which were contractually required to be sold, conveyed, transferred and contributed to the REIT.

9.      These deliberate, intentional and material misrepresentations induced Plaintiffs to enter into the September 2015 Transaction causing Plaintiffs to credit FC Purchasers for overly inflated value of the assets comprising the FC Portfolio, and by virtue thereof the purchase price which was to be paid by the FC Purchasers to Plaintiffs for the acquisition of the United Realty Entities[5]—all in exchange for properties which were supposed to be owned by the FC Purchasers and conveyed to the public REIT, but which in fact were either never owned and/or controlled by the FC Purchasers and never conveyed, contributed, transferred and delivered to the REIT, or had a significantly lower fair market value than Defendants represented.

10.      As a material inducement to Plaintiffs entering into the 2015 Transaction Agreements, Plaintiffs relied on certain representations and promises made to them by Defendants in the Letter Agreement including without limitation, with respect to eight (8) of the assets comprising the FC Portfolio which that Defendants represented would be contributed to the REIT and were to be transferred by deed to the public REIT.

11.      In the Letter Agreement, Defendants expressly represented that they would, and agreed "to file said deeds, or cause same to be filed in the appropriate recording offices...not later than the close of business Monday, September 21, 2015"—which Defendants completely failed to do, in breach of their promises and obligations as set forth in the Letter Agreement. As a result of Defendants' breaches of the Letter Agreement, Plaintiffs were denied

---

[5] The United Realty Entities are as follows: (1) United Realty Advisors, LP; (2) United Realty Advisor Holdings, LLC; (3) URA Property Management LLC; and (4) URTI GP, LLC.

9

the benefit of their bargain, and sustained damages such that rather than receiving the $74 million in consideration as required pursuant to the September 2015 Transaction Agreements, and after numerous breaches and subsequent defaults and renegotiations, Plaintiffs have through the date hereof, actually received only $12.5 million.

12.    Additionally, due to Defendants' breach, Plaintiffs were deprived of the fees that were to be generated by the assets Defendants' misrepresented in the Letter Agreement, to which Plaintiffs were entitled to receive *viz a vie* their 20% retained ownership interest in FC Advisors and 50% interest in First Capital Funds Management, LLC.

13.    Defendants fraudulently induced Plaintiffs to enter into the 2015 Transaction Agreements by conspiring with their clients, FC Purchasers, to conceal the fact that: (i) FC Purchasers lacked ownership and/or authority to contribute certain of the other assets comprising the FC Portfolio which the FC Purchasers were contractually required to transfer, convey and contribute to the public REIT; (ii) many of those assets comprising the FC Portfolio had clouded title such that they could not be transferred, conveyed and contribute to the public REIT; and, (iii) certain of the remaining assets comprising the FC Portfolio had a significantly lower value than Defendants represented.

14.    But for Defendants' fraudulent inducement, Plaintiffs would not have entered into the September 2015 Transaction, and would therefore, have continued to operate the United Realty Entities as they existed prior to the September 2015 Transaction, for which, URA alone, was valued at over $130 million.

## THE PARTIES

15.    Plaintiff JFURTI is a Delaware limited liability company with a principal place of business at 7 World Trade Center, 46th Floor, New York, New York.

10

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

16.     Plaintiff Jacob Frydman is an individual resident of the State of New York, and the principal of JFURTI. Frydman holds 47,680 shares of REIT common stock.

17.     Together, JFURTI and Frydman hold and/or controls in excess of 25% of all issued and outstanding shares of common stock of the REIT.

18.     Together, JFURTI and Frydman owned or controlled 100% of URA.

19.     Upon information and belief, Defendant Downey is a limited liability partnership organized and existing under, and pursuant to, the laws of the State of California. Downey is engaged nationwide in the general practice of law, including corporate, transactional and real estate law, with its principal office located at 621 Capitol Mall, 18th Floor, Sacramento, California 95814, and, upon information and belief, an office or offices in Nevada.

20.     Defendant Arostegui is an individual resident of the State of California, and at the time of the September 2015 Transaction an attorney and law partner at Downey. At all times relevant, Arostegui and Downey represented FC Purchasers.

                        JURISDICTION AND VENUE

21.     This Court has jurisdiction over this matter pursuant to CPLR §§ 301 and 302 because Defendants are present in and transact business within the State of New York and Defendants committed tortious acts with the State of New York, from which the causes of action arise.

22.     This Court has personal jurisdiction over Defendants because the agreements at issue provide that New York state and federal courts are the proper forum for any litigation between the parties and further provide that New York law governs any such disputes.

11

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM

NYSCEF DOC. NO. 2

INDEX NO. 651886/2019

RECEIVED NYSCEF: 04/01/2019

23.    Venue is proper pursuant to CPLR § 503 because the Plaintiffs reside in New York County, and the events or omissions giving rise to the claims occurred in New York County.

## BACKGROUND FACTS

24.    On or about September 15, 2015, Plaintiffs ("Seller Parties") sold 100% of the ownership interests in the United Realty Entities that controlled and operated the REIT ("Purchased Interests") to FC Purchasers, pursuant to the Transaction Agreements in a transaction substantially financed by Plaintiffs through a loan from JFURTI ("Purchase Money Loan") and acceptance of the $45 million in OP Units which were to be redeemed for cash over time..

25.    As a result, Plaintiffs, comprising part of the JF Parties (as defined in the Master Agreement) agreed to forego significant cash consideration at the closing of the transaction and rather agreed to this structure based on the Net Asset Values of the FC Portfolio that was required to be transferred, conveyed and contributed to the public REIT, and which were required to be redeemed for cash over a scheduled payout.

26.    The 2015 Transaction Agreements contemplated that title to the FC Portfolio assets sold, conveyed and contributed to the REIT would be transferred in one of several ways. Either the FC Purchasers would convey deeds to real property directly to the REIT's subsidiaries; or the FC Purchasers would contribute various valuable contract rights relating to specific properties; or they would assign their right, title and interest in various limited liability companies, which Defendants and FC Purchasers represented and warranted owned, directly or indirectly, the real property being conveyed.

27.    Regardless of the method or vehicle of conveyance, the parties all understood that the value of the deal derived from the value of the real property being conveyed,

12

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM

NYSCEF DOC. NO. 2

INDEX NO. 651886/2019

RECEIVED NYSCEF: 04/01/2019

whether directly or indirectly, by deed, contract right or membership interest. This understanding was memorialized in the Master Agreement and the Contribution Agreement and the Schedules attached thereto. The Master Agreement describes the assets being conveyed as "UPREIT Assets," which are defined as "a portfolio of [Buyer's] real estate assets and contract rights ... as set forth on Schedule 2." The first page of the referenced Schedule 2 contains a list of "Assets" – each of which is a description of a particular hotel, real estate asset, land or other property. Similarly, the Master Agreement recites Representations and Warranties (§§ 5.10(b) – (c)) relating to the FC Portfolio, referred to therein as the "UPREIT Assets", including representations that the FC Purchasers as the Seller Parties own 100% of the UPREIT Assets, or have the right to acquire 100% of the UPREIT Assets as specified. The Representations and Warranties are specific to the properties that constitute the UPREIT Assets (i.e. the hotels, real estate assets, land or other property).

28.     The FC Portfolio included eight (8) real estate assets (seven California assets and one Texas asset) which were required to be transferred to the REIT by deed and five hotel properties which was required to be transferred by to the REIT by assignments of one hundred percent of the ownership interests which the FC Purchasers purportedly held in special purpose entities which owned those properties.

29.     However, Plaintiffs have discovered, that contrary to the 2015 Transaction Agreements and the Letter Agreement, several properties in California, New Mexico and Texas, which were part of the FC Portfolio were never transferred to the REIT as required by the 2015 Transaction Agreements.

30.     Eight of the real estate properties comprising the FC Portfolio were required to be conveyed to the REIT by deed. Those included one property in Amarillo (TX),

13

two properties in Atwater (CA), one property in Merced (CA), three properties on Highway 99 (California) and one property in La Jolla (CA) (collectively, the "Deed Properties").

31.     Defendants, in concert with their clients FC Purchasers, represented, in the Master Agreement, that title to the Deed Properties was "good, marketable and insurable." Master Agreement § 5.10(b).

32.     Defendants, in concert with their clients FC Purchasers, also represented that they would convey, at the closing, "good and marketable title" which was "free from all claims, liens and encumbrance except only the Permitted Exceptions." *Id.* § 5.10(c)(i).

33.     On September 15, 2015, the day of the closing (the "Closing Date"), at the offices of the REIT in Manhattan, Singal represented to Frydman, on behalf of all the FC Purchasers, that he (Singal), by and through Defendants, and the other Seller Parties would undertake to promptly record the eight deeds to the Deed Properties in the various recording offices in California and Texas on behalf of, and for the benefit of, the REIT. Singal then handed the deeds to Frydman and asked him to give them to the Defendants, to take possession of the deeds, and cause those deeds to the Deed Properties to be properly recorded in their respective jurisdictions by September 21, 2015 at the very latest.

34.     In order to ensure that those instructions would be carried out, Frydman memorialized these instructions in a letter to Arostegui signed by Arostegui on behalf of Defendants—the Letter Agreement. In the Letter Agreement Arostegui acknowledged and agreed in writing that he, on behalf of his firm, Downey Brand, would take possession of the deeds to the Deed Properties and record those deeds by September 21, 2015.

35.     In the Letter Agreement, Defendants made false statements and material representations of fact concerning the assets. Defendants represented that "[a]mong the

14

Contributed Assets, are five hotel properties in New Mexico (Roswell, Farmington, Gallup, Grants and Albuquerque) which are each owned by special purpose entities, each of which special purpose entities are 91% owed by First Capital Real Estate Investments, LLC ("FCREI") and, with respect to which, FCREI has the right to transfer 100% of the ownership of said special purpose entities, and contribute same in accordance with the Agreements."

36.   Defendants further represented and stated in the Letter Agreement that "third parties unaffiliated with FCREI had entered into a contract to acquire some or all of the interest relating to the five hotel properties, and after beaching that contract, fraudulently and without authority, executed quitclaim deeds purporting to transfer the ownership of those properties to a number of entities unaffiliated with FCREI, and 25% to FCREI as tenancies in common."

37.   In the Letter Agreement, Defendants agreed to, and assumed the obligation to take possession of the eight (8) "original executed deeds with respect to the Contributed Assets which [were] being transferred by deed" and "to file said deeds, or cause same to be filed, in the appropriate recording offices in California and Texas on behalf of the grantees thereof, not later than the close of business Monday, September, 21, 2015."

38.   Arostegui and his firm had significant experience dealing in the purchase and sale of real estate.  Upon information and belief, Defendants knew or should have known that a conveyance of real property is not legally valid until the deed to the property is validly recorded in the appropriate recording office of the jurisdiction where the property is located.

39.   Unbeknownst to Plaintiffs at the time of the September 2015 Transaction, the written representations and warranties made by the FC Purchasers in the Master Agreement and Contribution Agreement, with respect to which they were represented by the Defendants,

15

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

and Defendants' direct representations that they would, and their contractual undertakings to, record the deeds to the Deed Properties by September 21 2015 were knowingly false and fraudulent, were made with the intent to induce plaintiffs to enter into the 2015 Transaction Agreements, and the plaintiff did reasonably rely thereon, to their detriment, and constituted fraudulent inducement.

40.     After the September 2015 Transaction closing, Frydman had several conversations with employees of First Capital Advisors, during which he discovered that the FC Purchasers and their counsel, Defendants, had known, even before the Closing, that the liens, encumbrances and other clouds on title would not and could not be cleared without litigation, which had not then been commenced, and that as a result, they would not be able to, and indeed could not be able to fulfill their contractual obligations and representations and warranties to, file said deeds to the Deed Properties as set forth in the Letter Agreement. In other words, Defendants knew that it was impossible to record the Deed Property Deeds by September 21, 2015 but nevertheless intentionally and knowingly fraudulently misrepresented to Plaintiffs that they could and would do so.

41.     Upon information and belief, based on the state of the negotiations at the time, Defendants, made their knowingly false and fraudulent misrepresentations, with the intent that Plaintiffs rely thereon, and Plaintiffs did, reasonably rely thereon to their detriment, because an honest disclosure would have revealed that the FC Purchasers as sellers did not own that which they claimed to own, that there were claims by 3rd parties that were potentially valid claims with respect to the ownership of said properties, that there were liens and encumbrances and clouds which would prohibit the transfer of those properties and would prohibit the filing of the deeds to the Deed Properties, and that therefore the deeds to the Deed Properties could not

16

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM

NYSCEF DOC. NO. 2

INDEX NO. 651886/2019

RECEIVED NYSCEF: 04/01/2019

be recorded as promised and represented and would therefore have caused the September 2015 Transaction to fail to close. Indeed, upon information and belief, Defendants knowingly made their false and fraudulent misrepresentations in order to induce Plaintiffs and its affiliates to enter into and close the September 2015 Transaction.

42.     Deeds to the Deed Properties were not recorded in the name of FC REIT or its subsidiaries by September 21, 2015 as promised, agreed to and represented by the Defendants. Indeed, upon information and belief, the deeds to the Deed Properties as of the date of this complaint, have still not been recorded in their respective jurisdictions, and title to the Deed Properties has never been transferred to the REIT and/or its subsidiaries. As a result, the fair market value of the FC Portfolio which was required to be transferred to the REIT was not $154 million, and the net asset value of the equity in the FC Portfolio, which was the basis of the valuation of the OP units issued to the FC Purchasers, was not $48 million, and as a result, Plaintiffs have been deprived of the bargain they contractually were to be paid for the transfer of their interests in URA and the other United Realty Entities, resulting in significant loss and damage to the Plaintiff's as hereinabove and hereafter described both as a result of Defendants' breach of contract, and as a result of Defendants' fraudulent inducement. Defendants knowingly employed devices, schemes, artifices and omissions to defraud, made untrue statements of material fact and/or omitted to state material facts, including, without limitation, that FC Purchasers were the owners of, controlled and/or or had the right to acquire, 100% of the ownership interests in the assets comprising the FC Portfolio which were required to be transferred to the REIT, and that the FC Purchasers as the Seller Parties could not , and in fact did not, deliver good and marketable title free from all claims, liens and encumbrances to the assets comprising the FC Portfolio, and specifically, with respect to Deed Properties, but

17

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

contrary contractual undertaking and fraudulent misrepresentations, the deeds could not be filed by close of business on September 21, 2015, or possibly ever.

43. ***New Mexico Properties to Be Conveyed to the REIT:*** Additionally, the FC Portfolio also included five real estate assets located in f Roswell, Farmington, Gallup, Grants and Albuquerque New Mexico (the "NM Properties") which were required to be conveyed, transferred and contributed to the REIT pursuant to the 2015 Transaction Agreements which were owned by single-purpose entities ("SPEs").

44. Defendants, together with and on behalf of FC Purchasers, represented that FC Purchasers would render indeed could convey 100% of the interest in those SPEs, which in turn owned the NM Properties to the REIT and its subsidiaries. While performing due diligence in anticipation of the Closing, Plaintiffs discovered that certain Quitclaim Deeds for each of the NM Properties had recently been filed of record evidencing that the NM Properties were owned by entities other than the SPE's which were represented to be the sole owners of the NM Properties, and which entities were not affiliates of nor owned by the FC Purchasers as the Seller Parties.. Suspecting that the FC Purchasers as the Seller Parties. did not have the ability to convey 100% of the interest in the NM Properties, Plaintiffs inquired about the ownership of the NM Properties.

45. In response to those inquiries, on or about August 30, 2015, Singal represented verbally to Frydman and then again via email to him and others that a First Capital entity previously had entered into a proposed sale leaseback agreement with the third parties appearing on those quitclaim deeds, but those third parties had breached the agreement, were not properly authorized to file those proclaimed deeds, that those quitclaim deeds constituted fraud and were not valid, and that he would provide evidence of same from his lawyers.

18

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

46.     To support his claim on August 30, 2015, Singal forwarded to Frydman an email written by Arostegui on behalf of his firm Downey and as Singal's and the FC Purchaser's lawyer, stating that the recordation of deeds to the NM Properties was "deceptive conduct," constituting "rogue actions" and "clear acts of fraud and slander of title." Arostegui also directly told Frydman that the quitclaim deeds filed by the third parties were fraudulent, unauthorized and invalid as a matter of law.

47.     To confirm the foregoing representations of Frydman reiterated in the Letter Agreement, what Defendants stated in the above referenced email, and Defendants confirmed, that as to the five NM Properties, FCREI owned 91% of the SPEs which owned the NM Properties, and that "FCREI has the right to transfer 100% percent of the ownership" of the SPEs owning the NM Properties, "and contribute same in accordance with the Agreements." Defendants also opined in the Letter Agreement that the quitclaim deeds filed by said unauthorized third parties purporting to transfer ownership of the NM Properties to entities unaffiliated with FCREI were fraudulent and unauthorized.

48.     The same representations are similarly repeated in Schedule 2 attached to the Master Agreement, which states that 100% of the interest in each of the five NM Properties was to be conveyed to the REIT and its subsidiaries.[6] Indeed the FC Purchasers had filed the same Schedule with the U.S. Securities and Exchange Commission ("S.E.C.") as part of their 8-K filing disclosing the September 2015 Transaction.

49.     Defendants' representations with respect to the ownership title to, transferability, authority, and rights to file such deeds to the NM Properties were knowingly false

---

[6] Schedule 2 contains a column titled "UPREIT Interest." The UPREIT Interest column sets forth the percentage interest in each entity that the Contributors would convey to the REIT and its subsidiaries. For each of the five NM Properties, the UPREIT Interest is listed as 100%.

19

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM INDEX NO. 651886/2019

NYSCEF DOC. NO. 2                                                  RECEIVED NYSCEF: 04/01/2019

and fraudulent when made. In fact, on information and belief, Defendants knew that the ownership of the NM Properties was the subject of a bona fide and valid dispute, and FC Purchasers did not in fact have the right or even the ability, until such dispute were resolved, to transfer 100% of the ownership of equity interests in the SPEs which owned the NM Properties as fraudulently represented.

50.     Plaintiffs have subsequently discovered that Defendants represented the FC Purchasers as counsel in heated and highly contested litigation regarding the ownership of the MN Properties brought by the parties which claim ownership, and that as late as 2017 that litigation was still on going and still unresolved. Thus, Defendants knew or should have known that the FC Purchasers did not have the right to transfer 100% ownership of the NM Properties to the REIT and its subsidiaries, and that the statements made orally on September 15, 2015 to Frydman by Arostegui to Frydman in New York, in writing in the August email, and writing in the Letter Agreement were false and fraudulent, and were made with the intent to deceive Plaintiffs and fraudulently induced them to enter into the 2015 Transaction Agreements.

51.     Upon information and belief, Defendants' representations regarding the contracts for, and title to, the hotel properties were materially false and knowingly false and fraudulent, were made with the intent to induce plaintiffs to enter into the 2015 Transaction Agreements, and the Plaintiff did reasonably rely thereon, to their detriment, and constituted fraudulent inducement.

52.     But for Defendants' false representation, Plaintiffs would not have entered into the September 2015 Transaction.

53.     In the Letter Agreement, Defendants further assumed the obligation and expressly agreed to take possession of the eight (8) "original executed deeds with respect to the

20

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM

NYSCEF DOC. NO. 2

INDEX NO. 651886/2019

RECEIVED NYSCEF: 04/01/2019

Contributed Assets which [were] being transferred by deed" and "to file said deeds, or cause same to be filed, in the appropriate recording offices in California and Texas on behalf of the grantees thereof, not later than the close of business Monday, September, 21, 2015."

54.     Defendants failed to record any of these deeds prior to September 21, 2015, or at any time thereafter, and knew at the time they made the representation – without disclosing such knowledge – that they would be unable to record any of these deeds unless and until the properties were unencumbered by tax liens and other debts, and the various title issues were resolved.

55.     Upon information and belief, Defendants knew at the time they made the representations in the Letter Agreement that the deeds referenced in the Letter Agreement could not be recorded until tax liens and other debts against the properties, which had not been disclosed and had actively been concealed, were paid and various title issues were resolved. Defendants knew facts or had access to information suggesting that their statements were not accurate and failed to check information they had a duty to monitor and disclose to Plaintiffs.

56.     Upon information and belief, Defendants knew or should have known that the liens, encumbrances and other clouds on title would not be cleared up by September 21, 2015, but nevertheless knowingly, recklessly and/or fraudulently represented that they could, and would, record the deeds by that date.

57.     Upon information and belief, Defendants made these representations because an honest disclosure that the deeds referenced in the Letter Agreement could not be recorded—which would have significantly diminished the value and number of assets their client, FC Purchasers, could contribute,  would have scuttled the September 2015 Transaction entirely.

21

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

58.     Upon information and belief, Defendants had been Singal's and his companies' counsel for several years prior to the September 2015 Transaction, and knew that there were liens, tax issues and other clouds on title that had to be remedied before the deeds could be recorded, and Defendants failed, in the first instance, to disclose those clouds on title.

59.     Upon information and belief, Defendants represented Singal and his companies when they purportedly acquired ownership interests in several, if not all of the assets that were encumbered by liens, tax issues and other clouds on title, such that Defendants knew, or should have known, that said deeds could not be recorded.

60.     Recording these deeds was crucial to the REIT claiming title to these assets, as well as accurately assessing the value of the contributed assets to the REIT, and correspondingly, the net asset valuation of the OP Units used to pay Plaintiffs the consideration as required for the September 2015 Transaction.

61.     Plaintiffs reasonably and foreseeably relied upon Defendants' false and fraudulent intentional misrepresentations, as FC Purchasers' counsel, that Defendants would record the eight (8) deeds in question as contracted and represented in the Letter Agreement.

62.     These deliberate and material misrepresentations were intended to, and in fact did induced the Plaintiffs to enter into the 2015 Transaction Agreements pursuant to which Plaintiffs sold and transferred  ownership in the United Realty Entities, in exchange for consideration that was less than that contracted for.

63.     As a direct and proximate result of Defendants' misrepresentations and breaches of the Letter Agreement, the FC REIT OP Units  Plaintiffs received in exchange for the sale of United Realty Entities were not worth the $45 million represented.

22

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM

NYSCEF DOC. NO. 2

INDEX NO. 651886/2019

RECEIVED NYSCEF: 04/01/2019

64.     As detailed herein, but for Defendants' false representations as detailed herein, Plaintiffs would not have entered into the September 2015 Transaction, and would have retained their full interest in, among other things, the United Realty Entities.

65.     In the months following their purchase of the United Realty Entities and gaining control of the REIT, FC Purchasers defaulted on multiple occasions on their obligations to make the payments required by the Purchase Money Loan and did not redeem the OP Units as contracted. Because of these defaults the consideration which was to be paid to Plaintiffs in connection with the September 2015 Transaction was renegotiated twice and ultimately the Purchase Money Loan was restructured pursuant to a written Settlement Agreement entered into by and among the Plaintiffs (the "JF Parties") on the one hand, and Singal, and various related FC entities, (the "FC Parties"), on the other hand,  pursuant to an agreement dated June 2, 2016 ("Settlement Agreement").

66.     In the Settlement Agreement, the parties agreed, inter alia, to the following terms: (a) the FC Parties agreed to pay to JFURTI ten million dollars ($10,000,000) by wire transfer; (b) the Purchased Interests would be transferred to a newly formed entity called First Capital Borrower, LLC ("FC Borrower"), which would execute and deliver to JFURTI a promissory note in the principal amount of $16,259,556.67 (the "Note"); (c) the JF Parties agreed to transfer the 2,887,304 Op Units held by JFURTI (" JFURTI OP Units"); and the JF Parties agreed to transfer and assign all of JFURTI's membership interests in the Advisor and FC Funds Management, LLC .[7]

---

[7] The Note is collateralized by a pledge of 1,465,827.58 units of the Operating Partnership, which now have been converted into 1,465,827.58 shares of stock of FC REIT.

23

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

67.     The Settlement Agreement further provided that payment of the Note would be guaranteed in writing (the "Guarantees") by FC Advisors and FCREI (and ten affiliated and subsidiary entities of (collectively, the "First Capital Guarantors").[8]

68.     At the timer of the Settlement Agreement plaintiffs were not aware of all of the various fraudulent activities and breaches of contract, and continued to believe that there was sufficient value in the assets transferred as part of the FC Portfolio to the REIT to generate sufficient fees and income to the Advisor and other guarantors who agreed to guarantee the new promissory note negotiated as part of the Settlement Agreement.

69.     However, as a result of the wrongs complained of herein, neither FC Advisors nor the other obligors or guarantors under the promissory note issued under the Settlement Agreement had the assets nor the net asset values sufficient to generate the revenues to pay the fees and other income which could be used to support the payment of the promissory note issued as part of the Settlement Agreement.

70.     In fact, the FC Purchasers never paid any of the principal due under the promissory notes negotiated to satisfy the obligations undertaken by them as part of the Settlement Agreement, and as of the writing of this complaint, Plaintiffs have been unable to collect more than several hundred thousand dollars under the promissory note, which has since been reduced to a judgment which as of this writing exceeds $23 million with accrued and unpaid statutory interest.

71.     On account of Defendants' breaches as detailed herein, Plaintiffs never received the consideration which they should have received and which they were owed in exchange for the sale of the United Realty Entities to the FC Purchasers pursuant to the

---

[8] After entering into the Settlement Agreement, the Borrower Parties defaulted on their payment obligations under the Note. The Note and Guarantees are in default and a judgment in the amount of $21,221,676.53 has been entered against the Borrower Parties. *See JFURTI, LLC v Suneet Singal et al.,* Sup. Ct. NY County, Index No. 656273/2016.

24

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM    INDEX NO. 651886/2019
NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 04/01/2019

September 2015 Transaction—a package of consideration worth in excess of $74 million for which Plaintiffs have received only $12.5 million.

72.      As stated herein, but for Defendants fraudulently inducing Plaintiffs to enter into the September 2015 Transaction, Plaintiffs would never have agreed to close the September 2015 Transaction, and thus, would have retained the United Realty Entities, including URA, which has been valued in excess of $130 million.

### FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT

73.      Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 72 of this Complaint as if each was repeated at length and verbatim herein.

74.      Plaintiffs entered into the Letter Agreement with Defendants as set forth in detail above.

75.      In the Letter Agreement, Defendants made an express promise that they would cause the eight (8) deeds in question to be recorded in the appropriate recording offices no later than September 21, 2015.

76.      Defendants breached the Letter Agreement by failing to record any of these deeds and knew at the time it made the representations – without disclosing such knowledge – that it would be unable to register any of these deeds because the properties were encumbered by tax liens and other debts, and title issues.

77.      Defendants' failures to perform their obligations and misrepresentations regarding the status of the assets as detailed herein, constitute material breaches of the Letter Agreement.

25

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

78.     As a result of Defendants' breach, Plaintiffs suffered damages in the amount of the difference between the contracted for benefit of their bargain of $74 million of overall consideration -- versus what Plaintiffs actually received, $12.5 million.

79.     Plaintiffs are therefore entitled to recover from Defendants the sum in excess of $61.5 million, plus interest, costs and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
## FRAUDULENT INDUCEMENT

80.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 79 of this Complaint as if each was repeated at length and verbatim herein.

81.     Plaintiffs entered into the Letter Agreement with Defendants as set forth in detail above.

82.     In the Letter Agreement, Defendants made false representations regarding the status of the assets to be contributed to the REIT, including, but not limited to: (i) the value of the assets; (ii) the marketability of the assets' titles; (iii) the ownership status of the assets relative to the FC Purchasers; and, (iv) the authority of the FC Purchasers to contribute the assets to the REIT.

83.     In the Letter Agreement, Defendants also falsely represented that they would take the deeds for the eight (8) Deed Properties and cause each of the deeds to be filed in the appropriate recording offices not later than the close of business on September 21, 2015. Defendants failed to record any of these deeds and knew at the time it made the representations – without disclosing such knowledge – that they would be unable to record any of these deeds because the properties were encumbered by tax liens, other debts, ownership issues and title issues.

26

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

84.     Defendants knew these representations were false at the time they were made and acted with conscious behavior and recklessness in making these misrepresentations. Defendants knew of or should have known of the tax liens and debts against the properties, which prevented them from causing the deeds to be recorded.  Defendants failed in the first instance to disclose the material fact of those clouds on title.

85.     Moreover, by virtue of their prior representation of Singal and his companies in real estate matters and throughout the diligence phases of the September 2015 Transaction, Defendants certainly knew that the existence of tax liens and debts on properties prevent title from being recorded.

86.     Plaintiffs relied on Defendants' representation that the deeds could and would be recorded – and thus that title to the properties would be transferred to the REIT – in agreeing to the value of the REIT and consideration being paid to Plaintiffs under the Master Agreement and Contribution Agreement.   Indeed, this calculation informed the terms under which Plaintiffs agreed to enter into the September 2015 Transaction.

87.     Thus, Defendants' false representation that the deeds could and would be recorded by September 21, 2015 fraudulently induced the Plaintiffs to enter into the September 2015 Transaction.

88.     These deliberate and material misrepresentations induced the Plaintiffs to enter into the Master Agreement and the Contribution Agreement pursuant to which they transferred ownership in the United Realty Entities and ceded control of the REIT, in exchange for assets that: (i) were significantly overvalued; (ii) had clouded and unmarketable title;  (iii) were not owned or controlled by the FC Purchasers; and, (iv) which Singal and the FC Purchasers had no authority to contribute.

27

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

89.     But for Defendants' fraudulent inducement, Plaintiffs would not have entered into the September 2015 Transaction. Thus, but for Defendants' fraud, Plaintiffs would have retained control of the United Realty Entities, including URA, which has been valued in excess of $130 million. Additionally, in being induced to sell their interests in the United Realty Entities, Plaintiffs were deprived of the fees that those entities would have (or did) collect from the disposition of various of the REIT's assets.

WHEREFORE, it is respectfully requested that this Court enter an Order:

a) On the First Claim for Relief, awarding damages in favor of Plaintiffs against Defendants in an amount to be determined at trial but in no event less than $61,500,000;

b) On the Second Claim for Relief, awarding damages in favor of Plaintiffs against Defendants in an amount to be determined at trial but in no event less than $130,000,000;

c) that the Court grant attorneys' fees for the cost of this action; and,

that the Court grant to Plaintiffs any such other and further relief as it deems just and proper.

## JURY TRIAL DEMAND

95.     Plaintiffs hereby demand that this case be heard before a jury as triable by right.

Dated: New York, New York
        March 29, 2019

28

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM

NYSCEF DOC. NO. 2

INDEX NO. 651886/2019

RECEIVED NYSCEF: 04/01/2019

THE LAW OFFICES OF NEAL BRICKMAN, P.C.

By:

Neal Brickman
*Attorneys for Plaintiffs*
420 Lexington Avenue, Suite 2440
New York, New York 10170
Tel: (212) 986-6840
Fax: (212) 986-7691
neal@brickmanlaw.com

29

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM
NYSCEF DOC. NO. 2

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

## VERIFICATION

STATE OF NEW YORK   )
                            ) ss:
COUNTY OF NEW YORK  )

**JACOB FRYDMAN**, being duly sworn, deposes and says:

I am a Plaintiff in this action and I am the Manager of Plaintiff JFURTI, LLC. I have read the

foregoing Verified Complaint and know the contents thereof. The same is true to my own

knowledge, except those matters therein which are stated to be alleged on information and belief

and as to those matters, I believe them to be true.

      Dated: March 29, 2019
      New York, New York

                                                  JACOB FRYDMAN

On the 29th day of March in the year 2019, before me, the undersigned notary public,
personally appeared Jacob Frydman, personally known to me or proved to me on the basis of
satisfactory evidence to be the individual whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his capacity, and that by his signature on the
instrument, the individual, and upon whose behalf of which the individual acted, executed the
instrument.

                                            Notary Public

DAVID ROSS SHAPIRO
Notary Public, State of New York
Reg. No. 02SH6335462
Qualified in New York County
My Commission Expires Jan. 11, 2020

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM

NYSCEF DOC. NO. 3

INDEX NO. 651886/2019

RECEIVED NYSCEF: 04/01/2019

# EXHIBIT "A"

FILED: NEW YORK COUNTY CLERK 04/01/2019 12:34 PM    INDEX NO. 651886/2019
NYSCEF DOC. NO. 3                                         RECEIVED NYSCEF: 04/01/2019

United Realty Trust Incorporated
60 Broad Street, 34th Floor, NY NY 10004
212.388.6800
Unitedrealtytrust.com



SEPTEMBER 15, 2015

Re: Sale of 100% of the Membership Interests in United Realty Advisors, LP

Anthony Arostegui, Esq.
Downey Brand
621 Capitol Mall 18th Floor
Sacramento, CA 95814

Dear Anthony,

This letter is intended to set forth certain matters in connection with closing of the various transactions pursuant to (i) that certain agreement dated September 14, 2015 (the "Master Agreement"), by and among the JF Parties (as defined in the Master Agreement) and the FC Parties (as defined in the Master Agreement) and (ii) that certain agreement dated September 14, 2015 (the "Asset Contribution Agreement"), by and among the Contributors, the Contributor Representative and URTI OP (each, as defined in the Asset Contribution Agreement). Capitalized terms in this letter shall have the meaning ascribed to such terms in the Master Agreement and/or the Asset Contribution Agreement (collectively the "Agreements").

Among the Contributed Assets, 8 assets are being transferred by deed, and the balance of the assets are being transferred by assignments of membership interests, partnership interests and/or contract rights. The deeds are being provided with respect to the Amarillo, Texas hotel, the three California assets owned by Central Valley Gas Station Atwater Partnership, LLC, the two California assets owned by Central Valley Gas Station development LLC, the Highway 99 Avenue number one property and the La Jolla property, both of which are owned by First Capital Real Estate Investments LLC. You have agreed that you will take the seven California deeds and the one Texas deed as escrow agent on our behalf, and cause each of the deeds to be filed of record in the appropriate recording offices for our benefit not later than the close of business Monday, September 21, 2015.

Among the Contributed Assets, are five hotel properties in New Mexico (Roswell, Farmington, Gallup, Grants and Albuquerque) which are each owned by special purpose entities each of which special purpose entities are 91% owned by First Capital Real Estate Investments, LLC ("FCREI") and with respect to which, FCREI has the right to transfer 100% of the ownership of said special purpose entities, and contribute same in accordance with the Agreements. You have advised that third parties unaffiliated with FCREI had entered into a contract to acquire some or all of the interest relating to the five hotel properties, and after breaching that contract, fraudulently and without authority, executed quitclaim deeds purporting to transfer the ownership of those properties to a number of entities unaffiliated with FCREI, and 25% to FCREI as tenancies in common.

You have advised that the referenced quitclaim deeds are invalid and unauthorized and we are relying on your advice with respect to same. We are therefore taking an assignment of 100% of the membership interests in each of the SPE's which own the properties pursuant to the terms of the Agreements.

By executing below, you are agreeing that in your capacity as escrow agent, you will take the original executed deeds with respect to the Contributed Assets which are being transferred by deed with you after today's closing, and you agree to file said deeds, or cause same to be filed, in the appropriate recording offices in California and Texas on behalf of the grantees thereof, not later than the close of business Monday, September 21, 2015.

INDEX NO. 651886/2019
RECEIVED NYSCEF: 04/01/2019

Please indicate your consent to act as escrow agent in accordance with the terms set forth in this letter by executing in the appropriate space below.

Very truly yours,

Jacob Frydman
Chairman & CEO

THE UNDERSIGNED HEREBY AGREES TO ACT AS ESCROW AGENT PURSUANT TO THE TERMS SET FORTH IN THIS LETTER.

Anthony Arostegui, Esq.

Consented to by:

First Capital Real Estate Investments, LLC

By: _____
      Suneet Singal, Manager

Date:    September 15, 2015